# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Daniel John Pittao,

                Petitioner,       Case No. 13-cv-14367

v.                         Judith E. Levy
                             United States District Judge

Steven Rivard,

                             Mag. Judge R. Steven Whalen
                Respondent.

_____/

# OPINION AND ORDER DENYING
# THE PETITION FOR WRIT OF HABEAS CORPUS [3] AND
# GRANTING IN PART A CERTIFICATE OF APPEALABILITY

## I. Introduction

Pending is petitioner Daniel John Pittao's application for a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2254. The petition challenges Petitioner's Oakland County, Michigan conviction for first-degree (premeditated) murder. *See* M.C.L. § 750.316(1)(a). Petitioner alleges that a witness's in-court identification of him was based on suggestive pretrial procedures, that his trial attorney was ineffective, that the trial court violated his rights by admitting certain evidence,

and that this Court should hold an evidentiary hearing on his claim of ineffective assistance of counsel. Respondent Steven Rivard urges the Court to deny the petition because Petitioner's claims lack merit and that the state courts' decisions were not contrary to federal law, did not unreasonably apply federal law, or unreasonably determine the facts. Because the state appellate court's adjudication of Petitioner's claims was objectively reasonable, the petition will be denied.

## II. Background

The victim in this case was Petitioner's estranged wife, Tamara Pittao, who was living in Novi, Michigan at the time of her death. Petitioner's first trial in Oakland County Circuit Court ended with a mistrial because the jury was unable to reach a unanimous verdict. Petitioner's second trial occurred in the fall of 2008. The Michigan Court of Appeals summarized the basic facts established at the second trial as follows:

> Daniel Pittao and Tamara Pittao were separated at the time of her murder, and she had recently filed a complaint for divorce. The police discovered Tamara Pittao's body in her apartment on Thanksgiving morning in 1997, during a welfare check after she had not been heard from for three days. Tamara Pittao's neck had been slit from ear to ear, but an examination also showed that she had been

2

asphyxiated. There were no signs of forced entry into her apartment, the apartment door was locked, and there was no evidence of a burglary, struggle, or sexual assault. Based on Tamara Pittao's last known contact with another person, the last use of her computer and telephone, the condition of her body, and the contents of her stomach, the prosecution believed that Tamara Pittao was killed sometime during the afternoon of Monday, November 24, 1997.

At the time Tamara Pittao was killed, two criminal matters were pending against Daniel Pittao. In one case, Daniel Pittao was charged with domestic violence arising from an incident between the couple in July 1997. Tamara Pittao filed her complaint for divorce shortly after that incident. In the other case, Daniel Pittao was charged with physically assaulting his son from a prior marriage; Tamara Pittao was a witness to that May 1997 incident. The prosecution presented testimony regarding the domestic violence incident and Daniel Pittao's assault of his son, along with other evidence of marital discord, at trial. The prosecution also presented evidence of Daniel Pittao's violent acts toward his first wife.

Daniel Pittao denied visiting Tamara Pittao's apartment during the week before her body was discovered. But a witness, David Jerome, testified that he saw a man at a dumpster outside Tamara Pittao's apartment building on November 24, 1997, between 3:00 and 4:00 p.m. According to Jerome, the man appeared out of nowhere as Jerome was bringing some trash to the dumpster, and the man looked surprised to see Jerome. The man ducked behind a black or blue "boxy-shaped" Chrysler vehicle that had been backed up to the gate of the dumpster. (At that time, Daniel Pittao

drove a blue Jeep Cherokee.)  In July 1998, Jerome viewed a photographic array and identified a photograph of Daniel Pittao as the man he saw at the dumpster.  At trial, Jerome testified that he had no doubt that Daniel Pittao was the man he saw at the dumpster.

The police considered Daniel Pittao a suspect in Tamara Pittao's death in 1997, but he was not charged until a grand jury indicted him in 2007.  The defense theory at trial was that the police inappropriately focused on Daniel Pittao as the only suspect despite the lack of evidence of his guilt; that the police engaged in questionable tactics in an attempt to manufacture a case against Daniel Pittao; that the police ignored evidence and failed to pursue leads that did not fit their theory; and that the tainted police investigation contributed to an atmosphere that caused witnesses to be biased against Daniel Pittao.

*People v. Pittao*, No. 290690, 2010 WL 3604423, at *1 (Mich. Ct. App. Sept. 16, 2010) (unpublished).

At the conclusion of the testimony and arguments, the trial court instructed the jury on both first-degree and second-degree murder, and on October 14, 2008, the jury found Petitioner guilty of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a).   On November 6, 2008, Petitioner was sentenced to life imprisonment.

Petitioner moved for a new trial and requested a directed verdict of acquittal on the grounds that (1) the eyewitness testimony was not

4

credible, (2) the verdict was against the great weight of the evidence, (3) there were critical flaws in the DNA evidence, (4) there was insufficient evidence of premeditation and deliberation, and (5) he recently discovered evidence of a new scientific procedure called "Touch DNA." The trial court denied Petitioner's motion on the basis that he had failed to meet his burden of showing entitlement to the relief he sought. *See* Order Denying Mot. for New Trial and Request for a Directed Verdict of Acquittal, *People v. Pittao*, No. 07-213536-FC (Oakland County Cir. Ct. Jan. 20, 2009).

Petitioner filed a second motion for new trial in which he argued through counsel that David Jerome's identification of him was the product of suggestiveness and that trial counsel was ineffective for failing to object to Jerome's testimony or seek a hearing on whether there was an independent basis for Jerome's identification. Petitioner also argued that counsel was ineffective for: advising the jurors that Petitioner's parental rights had been terminated as a result of the homicide investigation; mentioning that Petitioner had asserted his right to remain silent and his right to counsel when the police attempted to interview him; eliciting testimony that a witness gave the

5

victim a card for a domestic abuse shelter; and commenting on the fact that Petitioner had been incarcerated since his arrest in January of 2007.

Petitioner also claimed that defense counsel failed to investigate and secure the presence of a witness who would have supported his alibi claim. The trial court held oral arguments on Petitioner's motion and then denied it. *See* 10/14/09 Tr. of Hr'g on Mot. for New Trial; Order Denying Redacted Second Motion for New Trial, *People v. Pittao*, No. 07-213536-FC (Oakland County Cir. Ct. Oct. 14, 2009).

The Michigan Court of Appeals subsequently affirmed Petitioner's conviction, *see Pittao*, 2010 WL 3604423, and on September 4, 2012, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Pittao*, 492 Mich. 864 (2012) (table).[1] Petitioner filed his habeas corpus petition through counsel on October 16, 2013, and on October 21, 2013, he filed an amended petition.

## III. Standard of Review

### A. Generally

---

[1] Justice Michael F. Cavanagh voted to grant leave to appeal.

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's

7

decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

## B. Ineffective-Assistance-of-Counsel Claims

Petitioner's second and third claims, as well as a portion of his first claim, concern his trial attorney. The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly established federal law for purposes of ineffective-assistance-of-counsel claims. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). Under *Strickland*, a defendant must show that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

9

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* (internal citation omitted).

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

## IV.  Analysis

### A.  The Pretrial Identification of Petitioner

10

Petitioner alleges that prosecution witness David Jerome's trial testimony[2] about his observation of Petitioner on November 24, 1997, violated his right to due process because the testimony was the product of suggestiveness by the police. Petitioner further alleges that trial counsel's failure to raise this issue and to object to Jerome's recorded testimony before it was played for the jury constituted ineffective assistance of counsel.

The Michigan Court of Appeals rejected this claim because Petitioner failed to identify any impermissibly suggestive identification procedure. As for defense counsel's failure to move to suppress Jerome's identification, the Court of Appeals stated that, "[a]bsent an impermissibly suggestive identification procedure, any motion to suppress Jerome's identification testimony would have been futile," and "[c]ounsel was "not ineffective for failing to file a futile motion." *Pittao*, 2010 WL 3604423, at *3.

### 1. Clearly Established Federal Law

---

[2] Jerome did not testify in person at Petitioner's trial because he was in Hawaii at the time and unable to travel for health reasons. His testimony was videotaped, (*see* 10/1/08 Trial Tr.), and played for the jury on the following day. (*See* 10/2/08 Trial Tr., at 5-6.)

"The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability . . . ." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012).  An identification procedure violates due process of law if the confrontation was "'unnecessarily suggestive and conducive to irreparable mistaken identification.'"  *Neil v. Biggers,* 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).  "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.* at 198.

The Due Process Clause, however, "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry*, 132 S. Ct. at 730. Improper police action is a prerequisite to judicial checks on the reliability of an identification because "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays . . . ." *Id.* at 726.

12

## 2. The Facts

Jerome testified at trial that, in 1997, he lived in the same apartment complex as Tamara Pittao, and, on Monday, November 24, 1997, between 3:00 p.m. and 4:00 p.m., he saw a man by a dumpster near her apartment. On December 4, 1997, he attended an informational meeting at the apartment complex. The police posted pictures of a Chevy Blazer and a Jeep Cherokee at the meeting, and he associated the picture of a Jeep Cherokee with the vehicle that he had seen at the dumpster on November 24, 1997. He informed a police officer at the meeting what he had seen on November 24, 1997, and he made a brief written statement about what he had seen. He initially wrote that he saw the Jeep at the dumpster on November 24, 1997, but he changed the date to November 25, 1997, after he realized that, on the 25th of November he had a doctor's appointment and that must have been the reason he went home early that day.

Continuing, Jerome testified that, several months after the informational meeting at the apartment complex, the police came to his apartment and went over some personal papers with him to ascertain the date that he saw the man at the dumpster. As he walked out to the

13

parking lot with the officers, they showed him some pictures and asked him whether he recognized anyone in the pictures.  He identified the man in position number five, but he said that the jaw of another person in the photo array was similar to the jaw of the man that he had seen. At trial, however, he testified that the eyes and hair of the man in the fifth photograph were "a dead giveaway" (10/1/08 Trial Tr., at 10- 41, 149-50), and that he was certain the man whom he saw at the dumpster was the man pictured in position five of the photo array.  Petitioner was the man in photograph number five.  (*Id*. at 40-41.)

### 3. Application

Petitioner is not claiming that the photo array was unnecessarily suggestive.  Instead, he claims that the suggestiveness occurred when the police:  posted a photograph of a Jeep Cherokee like Petitioner's at the informational meeting; took Jerome to a Jeep dealership in July of 2008 and asked him if he saw any vehicles that resembled the one he saw on November 24, 1997; went through Jerome's personal papers with him to help him determine the date that he saw the man at the dumpster; and told him that Tamara Pittao died on November 24, 1997.

These factors were not unnecessarily suggestive or conducive to irreparable mistaken identification for the following reasons.

First, three witnesses (Jerome, Chief of Police David Molloy, and Detective Todd Anger) testified at trial that the police posted photographs of at least two different vehicles at the informational meeting. (*See* 10/1/08 Trial Tr., at 32, 51-52 (David Jerome's testimony that the police posted pictures of three or four vehicles, including a Chevy Blazer and a Jeep Cherokee, at the meeting); 9/11/08 Trial Tr., at 142-43 (Chief Molloy's testimony that the police showed photographs of a Chevrolet Blazer and Jeep Cherokee at the meeting and that they asked people in attendance whether they had seen similar vehicles in the area); 10/3/08 Trial Tr., at 85, 89, 91 (Detective Anger's testimony that a Jeep and a Blazer were displayed at the informational meeting).)

Second, Jerome stated that the police did not identify the Chrysler product (the Jeep Cherokee) as being the suspect's vehicle; rather he (Jerome) picked out the Jeep from among the photographs. (10/1/08 Trial Tr. at 54.) Additionally, his memory of going to the dealership was vague. *See id.*, at 42 (Jerome's testimony that he did not remember going to a car dealership); *cf. id.*, at 117-18 (Jerome's testimony that he

15

thought the police took him to a Chrysler dealership and that he could not remember whether the police also took him to other dealerships).

Third, Jerome testified that the man's eyes, hair, and facial expressions were what caught his attention. Also, he could not say for sure who told him that the death supposedly occurred on November 24, 1997, or when he learned the estimated date of death. (*Id*. at 65, 67-68.) Additionally, no one told him that Petitioner was the man in position number five of the photo array until long after he identified that photo. (*Id*. at 70.)

Fourth, although the police apparently went through Jerome's medical papers with him, it does not appear that they influenced his decision about the date that he saw the man at the dumpster. He explained at trial that he knew it was a Monday because he realized after he came home that day, that his doctor's appointment was on the following day, Tuesday, the 25th. (*Id*. at 141-44.) Furthermore, it was the police who questioned him as to how he happened to remember that he went home early on Monday, the 24th. At one point in his testimony, Jerome stated that he must have skipped work that afternoon, but later in his testimony he admitted that he had been unable to provide the

16

police with a reason for remembering that he went home early on Monday the 24th. (*Id*., at 142-44.)

In conclusion, Petitioner has failed to show that the police steered Jerome to Petitioner, independent of Jerome's "honest recollection." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009). The trial court therefore was not required to conduct a preliminary hearing on the reliability of Jerome's eyewitness identification. *Perry*, 132 S. Ct. at 730.

Furthermore, most of Petitioner's argument pertains to the manner in which Jerome's descriptions of Petitioner and his vehicle "morphed" over time. The reliability of Jerome's identification, however, was a matter for the jury to decide. *See id*. at 728 (stating that "the jury, not the judge, traditionally determines the reliability of evidence"); *see also United States v. Hill,* 967 F.2d 226, 233 (6th Cir. 1992) (stating that, "[s]ince the identification was sufficiently reliable, the district court properly left it to the jury to decide what weight to ultimately give to the identification"). The Court therefore finds no merit in Petitioner's claim that Jerome's pretrial identification of him was impermissibly suggestive.

17

### 4.  Defense Counsel's Failure to Raise the Issue

Petitioner contends that, as a result of pretrial suggestiveness, his trial attorney should have moved to suppress Jerome's identification testimony at trial.  Petitioner asserts that trial counsel's performance was deficient because it should have been obvious to him that Jerome's positive identification of Petitioner was the product of suggestive influence.  Petitioner asserts that the deficient performance was prejudicial because Jerome was not positive of his identification at Petitioner's first trial and that trial resulted in a hung jury.[3]  In contrast, Jerome was certain of his identification at the second trial where Petitioner was found guilty.

### a.  Clearly Established Federal Law

An attorney's "failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).  Instead, a defendant has the burden of demonstrating that his trial attorney was constitutionally deficient for failing to challenge the admission of identification testimony in a motion to suppress and that he suffered prejudice as a

---

[3] According to Petitioner, Jerome's testimony from the preliminary examination was read to the jury at the first trial.

18

result of his counsel's deficient performance. *Searcy v. Berghuis*, 549 F. App'x 357, 364 (6th Cir. 2013) (citing *Strickland*, 466 U.S. at 687), *cert. denied*, 134 S. Ct. 2708 (2014)).

To demonstrate prejudice, a habeas petitioner "must prove the pretrial identification procedure [was] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* (quotation marks and end citations omitted). If the procedure was unduly suggestive, the Court must "evaluate the totality of the circumstances to determine whether the identification nevertheless was reliable." *Id.*

### b. Application

Although trial counsel did not move to suppress the pretrial identification, he thoroughly challenged Jerome's identification of Petitioner. He cross-examined Jerome about: the vehicle he saw and the photographs shown at the informational meeting (10/1/08 Trial Tr., at 50-58); initially mentioning a black sedan as the suspect's vehicle (*id.* at 59-60, 78-79, 82); going to the Jeep dealership with the police (*id.* at 117-18); his description of the man (*id.* at 93-97); being told that Tamara Pittao's death occurred on Monday, November 24, 1997, and

19

having the police help him determine the date that he saw the man (*id.* at 67, 141-44).

Furthermore, as discussed above, the photo array itself was not impermissibly suggestive, and Petitioner has failed to show that police engaged in improper action that rendered Jerome's identification of Petitioner unnecessarily suggestive or conducive to irreparable mistaken identification. Therefore, defense counsel was not ineffective for failing to move to suppress Jerome's identification of Petitioner, and the state appellate court's decision on the issue was not contrary to, or an unreasonable application of, applicable Supreme Court precedent.

## B. Trial Counsel's Comments and Elicitation of Certain Testimony

Petitioner alleges that trial counsel deprived him of effective assistance when he elicited testimony that: Petitioner's parental rights were terminated without a trial as a result of the homicide investigation; Petitioner asserted his right to remain silent and his right to counsel when the police tried to interview him; Petitioner had been incarcerated since his arrest in January of 2007; and a witness

gave Tamara Pittao a card with information about a domestic abuse shelter.[1]

## 1. The Loss of Parental Rights

Petitioner contends that defense counsel should not have informed the jurors during opening statements (9/4/08 Trial Tr., at 38-39) that Petitioner's parental rights to his young daughter were terminated without a trial after Tamara Pittao's death.   Petitioner claims that there was no reasonable trial strategy for disclosing this information

---

[1]      Petitioner also alleges that trial counsel was ineffective for eliciting testimony that Petitioner had a drunk driving conviction.   Respondent contends that Petitioner did not exhaust state remedies for this claim.

Pursuant to 28 U.S.C. § 2254(b)(1), a habeas petitioner must exhaust state remedies for his claims before presenting them to a federal court in a habeas corpus petition.  This requirement is satisfied if a prisoner "invok[es] one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  To properly exhaust state remedies, a prisoner must fairly present the factual and legal basis for each claim to the state court of appeals and to the state supreme court.  *Wagner v. Smith*, 581 F.3d 410, 414-15 (6th Cir. 2009).

Petitioner maintains that he raised his drunk-driving claim in his second motion for new trial and in his brief before the Michigan Supreme Court.  This Court, however, has found no mention of the claim in Petitioner's appeal to the Michigan Court of Appeals, and submission of a new claim to the State's highest court on discretionary review does not constitute "fair presentation" for purposes of the exhaustion requirement of § 2254.  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).  Petitioner nevertheless has offered to dismiss the claim if the Court deems the drunk-driving claim to be unexhausted.  (Dkt. 10 at 10.)   The Court therefore considers the drunk-driving claim abandoned.

and that counsel's error was exacerbated when the prosecutor corrected

defense counsel and pointed out during closing arguments that there

had been a trial.  (10/7/08 Trial Tr., at 180.)

The Michigan Court of Appeals disagreed that there was no

reasonable trial strategy for referring to the termination of parental

rights.  The Court of Appeals noted that

> [p]art of the defense strategy was to portray Daniel Pittao as
> a victim of the concerted effort of Tamara Pittao's friends
> and family to punish him for Tamara Pittao's death,
> notwithstanding that he had not been criminally charged.
> Counsel suggested that the termination of Daniel Pittao's
> parental rights to his daughter was an example of how
> others had unfairly plotted against him, even though he had
> not been criminally charged with Tamara Pittao's death.

*Pittao*, 2010 WL 3604423, at *4.  The Court of Appeals went on to say

that:

> evidence that Tamara Pittao's parents, both of whom
> testified against Daniel Pittao at trial, had adopted Daniel
> Pittao's daughter after Daniel Pittao's parental rights were
> terminated was relevant to show their potential bias.

*Id.*  This observation is supported by the record.  (*See* 9/5/08 Trial Tr., at

133-35 (defense counsel's  explanation that his opening statement was

meant to show that the accusations against Petitioner were ephemeral,

22

that the witnesses were biased against him, and that the termination hearing was driven by mere speculation about Petitioner's guilt).) The Michigan Court of Appeals reasonably concluded that "[i]t was not an unreasonable strategy for defense counsel to argue to the jury that many of the witnesses had questionable motives." *Pittao*, 2010 WL 3604423, at *4.

As for defense counsel's comment that Petitioner did not have a trial before his parental rights were terminated, the Michigan Court of Appeals said the error did not affect the outcome of the trial. This Court agrees, because Tamara Pittao's parents indicated at trial that Petitioner's parental rights were terminated after a trial. (9/5/08 Trial Tr., at 72, 108.) The Court concludes that defense counsel's remarks and questions about the parental-termination proceedings did not amount to deficient performance and did not prejudice the defense.

## 2. Invoking the Right to Remain Silent and to have Counsel

Petitioner alleges next that trial counsel was ineffective for eliciting testimony from Detective Todd Anger and Lieutenant Victor Lauria that Petitioner invoked his right not to speak with them, that he had an attorney, and that he did not want to talk without his attorney

23

present.  (*See* 10/3/08 Trial Tr., at 60-65 (Detective Anger's testimony); 10/6/08 Trial Tr., at 105 (Lieutenant Lauria's testimony).)   Petitioner concedes, however, that counsel's trial strategy may have been to show that the police deliberately overcame his right to remain silent by trying to make him disclose information to other people.  (*See, e.g.*, 10/3/08 Trial Tr., at 63-65; 10/6/08 Trial Tr., at 106-07; 10/7/08 Trial Tr. at 17.)   In fact, the Michigan Court of Appeals opined that defense counsel elicited the evidence to show that "the police enlisted agents to secretly record or gain information from him."   *Pittao*, 2010 WL 3604423, at *4.  The Court of Appeals also stated that

> [d]efense counsel used this evidence to explain why Daniel Pittao had stopped cooperating with the police and to illustrate the lengths that the police were willing to go to build a case against him.  Defense counsel argued that Daniel Pittao, who was initially cooperative, was required to assert his constitutional rights to counsel and to remain silent because of the police's continued efforts to unfairly target him as the only suspect in Tamara Pittao's death, despite the lack of evidence showing that he committed the crime.

*Id*.  The Court of Appeals noted that "[t]his was consistent with the overall defense strategy of attacking the integrity of the police investigation and questioning the police motives."  *Id*.

24

Petitioner claims that defense counsel's tactic backfired because both Lieutenant Lauria and Detective Anger maintained that their tactics were perfectly legal. (10/3/08 Trial Tr., at 63; 10/6/08 Trial Tr., at 107-09; 10/7/08 Trial Tr. at 18). Defense counsel nevertheless left the impression that the police had engaged in questionable investigation tactics. Because this was a reasonable strategy, defense counsel was not ineffective for eliciting testimony that Petitioner invoked his right to remain silent when questioned by the police.

### 3. Evidence of Petitioner's Pretrial Incarceration and a Witness's Testimony about Giving the Victim a Card for a Domestic Violence Shelter

#### a. The Referral to a Domestic Violence Shelter

Petitioner alleges that trial counsel was ineffective for eliciting testimony that an interior decorator, Terry Windemuth, handed Tamara Pittao a card for a domestic violence shelter after Windemuth observed Petitioner and Tamara Pittao bickering in their home. Although Petitioner maintains that there was no strategic reason for eliciting this testimony, the record demonstrates that Windemuth's comment was an unresponsive answer to trial counsel's question as to whether Windemuth had hugged Tamara Pittao and told Tamara Pittao

25

that she (Windemuth) was proud of her.  Windemuth answered:  "I was proud of her.  I gave her a card for a domestic abuse shelter and my personal home number and said, if she ever needed me, to give me a call."  (9/23/08 Trial Tr., at 158.)

Windemuth had previously testified that she was very familiar with domestic violence, that she had been exposed to it, and that she knew what the signs were.  *Id*. at 156.  The Michigan Court of Appeals therefore opined that "[t]he purpose of defense counsel's cross-examination was to show that [Windemuth's] own experience with domestic violence clouded her perspective of the situation."  *Pittao*, 2010 WL 3604423, at *5.  The Court of Appeals correctly noted, moreover, that "[d]efense counsel immediately neutralized the effect of the response by clarifying that Tamara Pittao never called [Windemuth.]"  *Id*.  This Court agrees with the Court of Appeals that "defense counsel's questioning of [Windemuth] and handling of [Windemuth's] unresponsive answer was not objectively unreasonable."  *Id*.

### b.  Petitioner's Arrest and Incarceration

Petitioner blames his trial attorney for eliciting testimony from Detective Anger that Petitioner had been incarcerated since the time of

his arrest in 2007.  (10/3/08 Trial Tr., at 137.)  The Court of Appeals determined that there was no apparent purpose in eliciting this testimony, but that the testimony did not affect the outcome of the trial.

Defense counsel's question may have been part of his strategy of showing that the police unfairly targeted Petitioner and failed to consider other possible suspects.  In any event, the testimony in all likelihood did not affect the jury's verdict.  The testimony on this issue was a fleeting moment in a trial that lasted a month and a half.  There was considerable evidence linking Petitioner to Tamara Pittao's killing and demonstrating that he was an abusive person.  Thus, there is not a substantial probability that the outcome of the trial was affected by evidence that Petitioner was incarcerated before trial.  Because defense counsel's allegedly deficient performance was unlikely to have prejudiced the defense, counsel was not ineffective for eliciting the information.

### C.  Trial Counsel's Alleged Failure to Investigate and Produce a Defense Witness

Petitioner contends that his trial attorney was ineffective for failing to investigate and produce Joyce Willett, who was a lab technician at an Intertec manufacturing plant in Bardstown, Kentucky

in November 1997.   Petitioner contends that Willett would have established that he was in contact with her on the day Tamara Pittao was killed and, therefore, he could not have killed her.   Petitioner also contends that evidence of phone calls and faxes he and Willett exchanged on the afternoon of November 24, 1997, would have undermined David Jerome's testimony, as well as Christopher Nettle Duprey's testimony,[2] that they saw Petitioner at Tamara Pittao's apartment complex that day.   The Michigan Court of Appeals concluded on review of this claim that Willett would not have provided a substantial defense and, therefore, defense counsel was not ineffective for failing to call her as a witness.

### 1. Clearly Established Federal Law

---

[2]   Christopher Nettle Duprey testified that, between 1:00 and 2:30 p.m. on November 24, 1997, he saw a man and a woman in a blue Jeep at a gate to the apartment complex where the murder occurred.   According to Nettle Duprey, the man resembled a friend of his.   In January of 1998, he picked two photographs out a photo array that the police showed him: Petitioner's photograph in position number five and another man in position number three.   He claimed that the man pictured in position number five was the man he saw in the blue Jeep on November 24, 1997, but he said that it would be helpful to see the men in profile.   At the grand jury proceeding a year later, he was shown a similar set of photos with the men shown in profile, and at that time, he picked number three, which was not Petitioner.   (9/9/08 Trial Tr., at 26-40, 50-55; 10/6/08 Trial Tr., at 31, 99-100.)

28

Defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

Failure to conduct a reasonable investigation of a known and potentially important witness violates a defendant's Sixth Amendment right to the effective assistance of counsel. *Id*. at 259; *accord Jackson v. Bradshaw*, 681 F.3d 753, 762 (6th Cir. 2012) (stating that "[t]rial counsel renders ineffective assistance when he 'fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict'") (quoting *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (quoting *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006)); *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010) (stating "[t]he failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense"). And "the failure to call a known

29

alibi witness generally would constitute ineffective assistance of counsel." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). But the Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

## 2. Application

Petitioner has presented three affidavits in support of his claim about defense counsel's failure to investigate and call Joyce Willett as a witness. The first affidavit is from Willett, who avers in an affidavit dated August 12, 2009, that she and Petitioner were scheduled to attend a meeting at the General Motors "Tech Center" in Warren, Michigan on Tuesday, November 25, 1997. Willett asserts that, in preparation for that meeting, Petitioner would have confirmed that she had a sample to submit at the meeting and that they would have discussed an agenda for the meeting, a travel itinerary, and directions to the meeting. The significant paragraphs of the affidavit read as follows:

> 8. I do not have a specific recollection of when any particular conversation would have taken place on 11/24/97 in anticipation of the Tuesday meeting, however, I am quite

30

certain that we would have done planning-type phone calls throughout the day on 11/24/97.

9.  In addition to phone calls, I am fairly confident that Mr. Pittao would have fax'd me one or more documents in anticipation of the Tuesday trip, most likely on Monday . . . .

. . . .

11.  I do have a specific recollection of Mr. Pittao's demeanor on Tuesday 11/25/97.  He appears to be his "normal" self.  He was joking and laughing during the meeting at the Tech Center, and at lunch following the meeting, he was in good spirits.  He did not seem bothered, distracted or depressed.

. . . .

14.  Had I been subpoenaed to appear at Mr. Pittao's trial, I would have appeared and I would have offered the foregoing testimony.

(Dkt. 3-7 at 2-4.)

Petitioner avers in an affidavit signed on October 14, 2009, that he informed his trial attorney he was working in his office at Intertec in Southfield, Michigan on November 24, 1997, and that he was in contact with Willett and other employees from the Bardstown facility that day. Petitioner also states in his affidavit he wanted counsel to present evidence from the Bardstown employees to establish his whereabouts on

31

November 24 and November 25, 1997. He claims that his attorney instructed him to find out how to contact the Bardstown employees and that his attorney later confirmed that Petitioner's sister had provided him with the information. (*See* Dkt. 3-11 at 2-3.)

Petitioner's sister, Julie Pittao, avers in an affidavit signed on October 14, 2009, that, at Petitioner's request, she contacted the Bardstown employees, including Joyce Willett, and that the employees were friendly, cooperative, and willing to help. Julie Pittao goes on to say that she provided Petitioner's trial attorney with information about the Bardstown employees before Petitioner's second trial and that the attorney said he would be contacting the employees. (*See* Dkt. 3-12 at 2-3.)

The affidavits of Petitioner and his sister indicate that they informed Petitioner's trial attorney about Joyce Willett and other Bardstown employees. None of the three affidavits, however, establish that defense counsel failed to investigate the matter. Julie Pittao's affidavit, in fact, indicates that defense counsel said he would contact the Bardstown employees. Even assuming that defense counsel was aware of Willett and failed to investigate what she had to say, the

32

Michigan Court of Appeals reasonably concluded that Willett would not have provided a substantial defense.

First, Willett's affidavit is vague as to when she actually had contact with Petitioner. At best, she states, "I am quite certain that we would have done planning-type phone calls throughout the day on 11/24/97" and that, most likely on Monday (November 24, 1997), Petitioner "would have fax'd me one or more documents in anticipation of the Tuesday trip." (Dkt. 3-7 at 3.)

Even if Willett had testified consistently with her affidavit, the jury could have concluded that Petitioner was able to commit the murder on Monday, November 24, 1997. As explained by the Michigan Court of Appeals, Willett's

> testimony only would have established that she spoke to Daniel Pittao on the telephone at some unspecified time on Monday, November 24, 1997. At trial, Daniel Pittao's coworker testified that Daniel Pittao was at his office during the morning on Monday, November 24, 1997, but was not there that afternoon. Daniel Pittao's office computer showed that the last activity that day occurred at 12:42 p.m. The prosecution's theory was that Tamara Pittao was killed later in the afternoon of November 24, 1997. Evidence was presented that the computer in Tamara Pittao's apartment was last used at 2:17 p.m. that day, and telephone records indicated that the last call placed from her apartment that

33

day was made at 1:53 p.m.  Willett's proposed testimony would not have prevented the jury from consistently finding that Willett spoke to Daniel Pittao when he was at his office during the morning of November 24, 1997, and that Daniel Pittao killed Tamara Pittao later that afternoon, when, according to other evidence, Daniel Pittao was away from the office and Tamara Pittao likely was killed.

*Pittao*, 2010 WL 3604423, at *5.

Norris P'Simer, in fact, testified that she was the administrator of the phone system at Intertec in Southfield, Michigan and that about thirty people at Intertec contacted their manufacturing plants at Bardstown and one other location.  (9/30/08 Trial Tr., at 170.)  She was unable to determine who placed the calls from Intertec to its plant in Bardstown on November 24, 1997.  (*Id.* at 48-51.)[3]

As for Willett's statement that Petitioner appeared to be his normal self on Tuesday, November 24, 1997, the Court of Appeals said that this would not have provided a substantial defense, because "[o]ther testimony was presented that Daniel Pittao seemed emotionless

---

[3]  Interestingly, defense counsel used the lack of an alibi for the afternoon of November 24, 1997, to argue that Petitioner had no involvement in the murder. (10/7/08 Trial Tr., at 149-50.)   Counsel reasoned that if Petitioner had killed Tamara Pittao, he would have thought of someone who could vouch for his whereabouts.

when telling others about Tamara Pittao's death and at her funeral." *Pittao*, 2010 WL 3604423, at *6. The record supports the state court's conclusion. (*See* 9/22/08 Trial Tr., at 108 (Patricia Dodson-Plonski's testimony that Petitioner was unemotional when describing Tamara Pittao's death and cremation to him); *id.* at 132 (Jane Scafe's testimony that Petitioner showed no emotion and was his usual self when he discussed funeral arrangements for Tamara Pittao); 9/29/08 Trial Tr., at 159, 180-81 (Byron Bardis' testimony that Petitioner was not emotional when he told Bardis about Tamara Pittao's death); 9/30/08 Trial Tr., at 26 (Deborah Norris P'Simer's testimony that Petitioner was very matter-of-fact when he spoke to her about Tamara Pittao's murder).) Given this testimony, the Michigan Court of Appeals reasonably concluded: "the fact that Daniel Pittao did not act noticeably different one day after Tamara Pittao was killed would not have made a difference in the outcome of the trial." *Pittao*, 2010 WL 3604423, at *6.

An additional reason that Willett's testimony would not have provided a substantial defense is that the defense expert witness, Dr. Werner Spitz, opined that Tamara Pittao's death occurred between 9:00 p.m. on Tuesday, November 25, 1997, and 9:00 a.m. on Wednesday,

35

November 26, 1997. (10/6/08 Trial Tr., at 141, 152, 173.) In light of this theory, Willett's testimony that she was in contact with Petitioner on Monday, November 24, 1997, would have been irrelevant and possibly confusing to the jury.

Defense counsel could have argued in the alternative that, even if Tamara Pittao were killed on November 24, 1997, as the prosecutor claimed, Petitioner was at his office that afternoon and in touch with Willett. But there was evidence that Petitioner informed his secretary (Deborah Norris P'Simer) in a recorded phone call that he left the office at 2:00 p.m. that day (9/30/08, at 35, 103-04), and Norris P'Simer testified that Petitioner was not in the office when she came back from lunch that day (*id*. at 99-101, 105-06). Defense counsel would have had to contradict Petitioner's own statements to his secretary if Willett had testified consistently with her affidavit that she was in contact with Petitioner throughout the day on November 24, 1997. Defense counsel may have concluded that it was better to rely on Dr. Spitz' expert testimony regarding the time of death than to rely on Willett's vague recollection of what occurred eleven years earlier.

"There are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S., at 689, and the question on habeas review is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter,* 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). Furthermore, AEDPA review of ineffectiveness claims "must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (*per curiam*) (quotation marks and end citations omitted).

Here, there exists a "reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105. Therefore, the state appellate court's decision was objectively reasonable. Relief will not be granted on Petitioner's claim regarding trial counsel's alleged failure to investigate and produce Joyce Willett as a witness.

### D.  The Trial Court's Evidentiary Rulings

Petitioner alleges next that the trial court's evidentiary rulings violated his right to due process and a fair trial and his right to confront the witnesses against him. The evidence in question includes:  (1)

37

statements that Tamara Pittao made during an incident on May 16, 1997; (2) a personal protection order (PPO), which prevented Petitioner from assaulting, striking, beating, molesting, or wounding Tamara Pittao; and (3) Petitioner's prior acts of domestic violence against his son and former wife.

### 1. Due Process and a Fair Trial

Petitioner asserts that the propensity and "other acts" evidence deprived him of due process and his right to a fair trial. He contends that evidence of violence against his son and his first wife should have been excluded under Michigan Rule of Evidence 403 (exclusion of evidence on grounds of prejudice, confusion, or waste of time). Petitioner asserts that evidence of an incident involving Tamara Pittao on May 16, 1997, was not supported by her comments to the police that day.

### a. Legal Framework

Errors in the application of state law, especially rulings on the admission or exclusion of evidence, usually are not questioned on habeas corpus review, *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), because "federal habeas corpus relief does not lie for errors of

state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  Thus, the alleged violation of Michigan Rule of Evidence 403 is not a cognizable claim on federal habeas review.  *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009).  A state-court's evidentiary error does not rise to the level of a federal constitutional claim warranting habeas corpus relief "unless the error render[ed] the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *McGuire*, 502 U.S. at 69-70).

Furthermore, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*,  329 F.3d 496, 512 (6th Cir. 2003).  Consequently, "there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to' under AEDPA." *Id*. at 513.  For the following additional

reasons, the Court finds that it was not fundamentally unfair to admit the disputed propensity and "other acts" evidence.

### b. The PPO

Petitioner alleges that the PPO contained hearsay statements made by Tamara Pittao. The record indicates that Tamara Pittao acquired the PPO against Petitioner on July 8, 1997, and that the PPO prohibited Petitioner from assaulting, striking, beating, molesting, or wounding her. (9/11/08 Trial Tr., at 147; 9/12/08 Trial Tr., at 18.)

The Michigan Court of Appeals determined that the evidence was admissible under Michigan Comp. Laws § 600.2106, which states that court orders issued under seal are admissible in evidence and are prima facie evidence of all facts recited in the order. The Court of Appeals also stated that evidence of the PPO was not unfairly prejudicial under Michigan Rule of Evidence 403, which states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In reaching its conclusion, the Court of Appeals stated that

> [t]he PPO evidence was relevant to show marital discord and the nature of the relationship between Daniel Pittao and Tamara Pittao. The potential for unfair prejudice was low because Daniel Pittao had acknowledged the existence of the PPO during a police interview, as well as the domestic violence incident that led Tamara Pittao to obtain it.

*Pittao*, 2010 WL 3604423, at *6.

The state court's interpretation of state law binds the habeas court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001) (stating that, "[b]ecause state courts are the final authority on state law, federal courts must accept a state court's interpretation of its statutes and its rules of practice") (internal citation omitted)). The record, moreover, supports the state court's observation that Petitioner acknowledged the existence of the PPO. Chief of Police David Molloy testified that, when he interviewed Petitioner and asked him whether there was a history of domestic violence, Petitioner responded that there was an incident in July of 1997, and that it resulted in Tamara Pittao getting a PPO against him. (9/11/08 Trial Tr., at 123; 9/12/08 Trial Tr., at 165, 171; 10/7/08 Trial Tr., at 23-24.)

41

Furthermore, before Chief Molloy testified about the content of the PPO, the trial court read the following instruction to the jury:

> THE COURT:  All right.  The People are introducing into evidence the personal protection order, the quote, "PPO," unquote, Tammy Pittao obtained from the Oakland County Circuit Court against the Defendant.  The PPO is being introduced for the sole purpose of showing that there was marital discord between the Defendant and Tammy and to refute attempts by the Defendant to discount the same.
>
> However, you must not use the PPO for the purpose of showing that the Defendant acted in conformity with the acts precluded by the order or that the judge's decision to enter the PPO was correct.

(9/12/08 Trial Tr., at 18.)  In light of this instruction and the fact that Petitioner acknowledged the PPO in an interview with Chief Malloy, it was not fundamentally unfair to admit evidence of the PPO and its contents.

### c.  Violence against Petitioner's Son and First Wife

Petitioner asserts that evidence of violence against his first wife, (*see* 9/26/08 Trial Tr., at 13-26), should have been excluded because the incidents occurred more than ten years before Tamara Pittao's death. Additionally, Petitioner claims that the evidence was uncorroborated

42

and dissimilar to Tamara Pittao's injuries. Petitioner asserts that evidence of the assault on his son, (*see* 9/23/09 Trial Tr., at 31-41, 64, 70), was the least probative and the most unfairly prejudicial of the evidence in this category because he was acquitted of the assault after a jury trial.

The Michigan Court of Appeals stated that the disputed evidence was admissible under Mich. Comp. Laws § 768.27b(1), which permits courts to admit evidence of a defendant's other acts of domestic violence in a case where the defendant is charged with domestic violence. Although the statute limits such evidence to events that occurred within ten years of the charged offense, an exception can be made if the trial court "determines that admitting this evidence is in the interest of justice." Mich. Comp. Laws § 768.27b(4).

The Court of Appeals determined that the trial court did not abuse its discretion in admitting evidence of Petitioner's abuse toward his first wife even though the abuse occurred more than ten years before Tamara Pittao's death. The Court of Appeals noted that there were similarities between (1) the types of matters that provoked Petitioner's

reactions and (2) Petitioner's conduct toward his first wife and his abusive treatment of Tamara Pittao and his son.

The trial court, moreover, cautioned the jurors not to convict Petitioner because they thought he was guilty of other bad conduct. The court also charged the jurors not to use evidence of other bad conduct, including incidents of domestic violence for which Petitioner was not on trial, to decide that he was a bad person or likely to commit crimes. (10/7/08 Trial Tr., at 196-97.)

Finally, any inconsistencies in the first wife's testimony "go to the weight of the evidence—not to its admissibility." *People v. Barrera*, 451 Mich. 261, 289 (1996). For all of these reasons, it was not fundamentally unfair to admit evidence of Petitioner's violence toward his son and his first wife.

### d. The May 16, 1997 Incident and Threat

Petitioner claims that evidence of his confrontation with Tamara Pittao on a highway on May 16, 1997, should have been excluded because her comments to the responding police officer indicate that she was not assaulted, threatened, or run off the road. Tamara Pittao's comments to the officer were not quoted at trial, but the officer did

44

testify that Petitioner did not break the law during that incident and that he was not arrested as a result of the incident. (9/23/08 Trial Tr., at 187, 195-96.)

Even assuming that Tamara Pittao failed to tell the officer that she was assaulted, threatened, or run off the road, Curtis Jurgenson testified at trial that Tamara Pittao telephoned him during the incident and informed him that Petitioner was chasing her in his car, weaving in and out of lanes, flashing his lights, and honking his horn. (9/16/08 Trial Tr., at 16.) Wendy Smitter, moreover, testified that Tamara Pittao informed her that Petitioner had tried to force her off the road and when they both stopped their vehicles, Petitioner approached her car and pounded on the window. He screamed obscenities at her and said, "You're not leaving me. You're not leaving me. I will kill you if you leave me. You are not leaving me." (9/22/08 Trial Tr., at 166-67.)

Petitioner claims that Smitter and Jurgenson's testimonies were "grossly inconsistent" with Tamara Pittao's comments to the responding police officer. But any inconsistencies in testimony affect the weight the jury chooses to accord the testimony; it does not necessarily negate its substance. *People v. Naugle*, 152 Mich. App. 227, 236 (1986). And the

weight to be accorded to competing evidence is a matter for the jury to determine. *People v. Unger*, 278 Mich. App. 210, 228 (2008).

Furthermore, although Petitioner argued in state court that Tamara Pittao's comments to Smitter and Jurgenson were inadmissible hearsay, the state courts disagreed. The Michigan Court of Appeals stated that those statements were admissible under two exceptions to the hearsay rule: the "present sense impression" exception of Michigan Rule of Evidence 803(1) and the "excited utterance" exception of Michigan Rule of Evidence 803(2). The Court of Appeals stated that

> [t]he statements were admissible under the present sense impression exception because they involved Tamara Pittao's descriptions of Daniel Pittao's conduct while she was perceiving the conduct or immediately thereafter. The statements were also admissible under the excited utterance exception because they related to a startling event (Daniel Pittao's attempts to force Tamara Pittao off the freeway and his subsequent threatening conduct), and they were made during the events, while Tamara Pittao was upset and frightened, and thus was under the stress of excitement that Daniel Pittao's conduct caused.

*Pittao*, 2010 WL 3604423, at \*7 (footnotes omitted). The state court's interpretation of state law binds this Court sitting in habeas corpus, *Richey*, 546 U.S. at 76; *Israfil*, 276 F.3d at 771, and because the hearsay

46

testimony was admissible under state law, it was not fundamentally unfair to admit the testimony. *See Brecht v. Abrahamnson*, 507 U.S. 619, 637 (1993).

### 2.  The Confrontation Clause

Petitioner asserts that Tamara Pittao's statements in her application for a PPO and statements in the PPO itself were inadmissible at trial because they violated his right of confrontation. Tamara Pittao apparently stated in her application for the PPO that she was seeking protection from the items  checked on the form, and the PPO itself indicated that Petitioner was prohibited from assaulting, attacking, beating, molesting, or wounding Tamara Pittao.

The Michigan Court of Appeals stated that the statements in the PPO did not violate Petitioner's right of confrontation because he had a right to a hearing within fourteen days of the PPO being issued and, therefore, a prior opportunity to cross-examine Tamara Pittao about her statements.   Petitioner asserts that this conclusion was clearly erroneous because (1) the decision not to contest a PPO cannot be construed as acquiescence to the accusations in the order and (2) the motive to cross-examine in a PPO proceeding is not the same as the

47

motive to cross-examine a non-testifying declarant in a murder trial years later.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The right to confront witnesses includes the right to cross-examine them. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing *Pointer v. Texas*, 380 U.S. 400, 404, 406-07 (1965)).

Here, the trial court instructed the jury that the PPO was admitted to show there was marital discord between Petitioner and Tamara Pittao and to refute attempts by Petitioner to discount the marital discord. (9/12/08 Trial Tr., at 18.) Despite the trial court's holding that the PPO was not admitted for the truth of what Tamara Pittao said in her application for the PPO, Petitioner's right of confrontation was implicated.

The Court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the

48

'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1967) . . . ." *Fry v. Pliler*, 551 U.S. 112, 112 (2007). Under *Brecht*, the Court is to determine whether the violation of the Confrontation Clause had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.

On review of the entire record before the jury, it is clear that the admission of the PPO was harmless, and did not have substantial and injurious effect or influence in determining the jury's verdict. This is especially true because there was other admissible evidence that led to the entry of the PPO.

### 3. Ex Post Facto Laws

Petitioner concedes that much of the evidence concerning his prior acts of domestic violence was admissible under Michigan Compiled Laws § 768.27b, which makes propensity evidence admissible in domestic relations cases. He argues, however, that the statute became effective in May of 2006, and that its application to his case where the crime occurred in 1997 violated his rights under the Ex Post Facto Clause.

### a. Clearly Established Federal Law

49

"The Constitution prohibits both federal and state governments from enacting any '*ex post facto* Law.'" *Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013) (quoting U.S. CONST. Art. I, § 9, cl. 3; Art. I, § 10). Four categories of laws are prohibited by the Constitution's *Ex Post Facto* Clauses:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386, 390 (1798) (*seriatim* opinion of Chase, J.)

## b. Application

Petitioner alleges that the application § 768.27b violated the fourth category, that is, a change in the law which alters the rules of evidence or allows different testimony than what was admitted at the time of the offense. Petitioner contends that, while previously character evidence was forbidden under Michigan Rule of Evidence 404(b), §768.27b permits the use of evidence of domestic violence for any

purpose, including propensity. He claims that this violates the *Ex Post Facto* Clause because the prohibition against propensity and character evidence has been retroactively removed. According to Petitioner, the statute changes the type of evidence that can be used against a defendant, and it is not "evenhanded" in application because there is no reciprocal provision allowing evidence of the complainant's violence.

The Michigan Court of Appeals held that application of § 768.27b to Petitioner's case did not violate the *Ex Post Facto* Clause because the statute "only affects the admissibility of a type of evidence and does not change the burden of proof necessary to establish a crime, ease the presumption of innocence, or downgrade the type of evidence necessary to support a conviction." *Pittao*, 2010 WL 3604423, at *8. Petitioner contends that the Court of Appeals ignored both the purpose of the law, which is to make it easier to convict those accused of violence against one's spouse, and the fact that the law downgrades the prosecution's burden of proof. Ordinary rules of evidence, however,

> do not violate the Clause. Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of

innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as "unfair" or "unjust," they do not implicate the same *kind* of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard.

*Carmell v. Texas*, 529 U.S. 513, 533 n.23 (2000) (internal citation omitted).

In *Carmell*, the dispute was about a new statute that authorized conviction of certain sexual offenses on the victim's testimony alone. The previous statute required a victim's testimony to be corroborated before a defendant could be convicted of a sexual offense. The Supreme Court held that retroactive application of the new statute violated the *Ex Post Facto* Clause because it "changed the quantum of evidence necessary to sustain a conviction." *Id*. at 530.

As in *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), the change in the statute at issue here did "not alter the quantum of evidence necessary to convict [Petitioner]. Rather, it expanded the range of admissible testimony." *Id*. at 801. Thus, Petitioner's rights under the *Ex Post Facto* Clause were not violated.

### E. Evidentiary Hearing

52

In his fifth and final claim, Petitioner points out that the state courts declined to hold an evidentiary hearing on his motion for new trial and his claim of ineffective assistance of counsel. The state trial court opined that an evidentiary hearing was unnecessary, and the Michigan Court of Appeals declined to remand the case for an evidentiary hearing on the basis that: Petitioner's challenges were "insufficient to raise a constitutional infirmity;" he "fail[ed] to substantiate his allegations with factual support;" and the "record [was] sufficient to review [his] claims." *Pittao*, 2010 WL 3604423, at *6. Petitioner contends that this conclusion was contrary to, and an unreasonable application of, federal precedent because the proposed facts before the state court would establish ineffective assistance of trial counsel. Petitioner also contends that this Court is not precluded from holding an evidentiary hearing.

To the extent Petitioner is arguing that his right to an evidentiary hearing under state law was violated, his claim lacks merit because "a federal court may not issue a writ of habeas corpus on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). This Court is limited to deciding whether Petitioner's conviction

53

violated federal law. *McGuire*, 502 U.S. at 67-68. Here, Petitioner "cites no Supreme Court precedent indicating that a defendant has a constitutional right to an evidentiary hearing in state court to develop his claim of ineffective assistance of counsel . . . ." *Hayes v. Prelesnik*, 193 F. App'x 577, 584 (6th Cir. 2006).

Furthermore, Petitioner's additional argument that this Court is not precluded from holding an evidentiary hearing is not supported by Supreme Court precedent. The Supreme Court has held that a federal court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

The Michigan Court of Appeals adjudicated Petitioner's claims about trial counsel on the merits. On the issue of counsel's failure to challenge David Jerome's identification testimony, the Court of Appeals stated that a motion to suppress Jerome's identification testimony would have been futile, and counsel was not ineffective for failing to file a futile motion. *Pittao*, 2010 WL 3604423, at *3. On the matter of defense counsel's comments and conduct, the Court of Appeals stated that defense counsel's conduct was a matter of trial strategy, that

54

Petitioner had not overcome the presumption that defense counsel's strategy was reasonable, that counsel's handling of Windemuth's unresponsive answer about a domestic violence shelter was not objectively unreasonable, and that there was no reasonable probability counsel's conduct affected the outcome of the trial. *Id*. at *3-*5. Finally, on the issue of defense counsel's failure to call Joyce Willett as a witness, the Court of Appeals concluded that defense counsel was not ineffective for failing to call her as a witness because the proposed testimony would not have provided a substantial defense. *Id*. at *6.

Because the state court adjudicated Petitioner's claims regarding trial counsel on the merits, this Court cannot hold an evidentiary hearing to consider new testimonial evidence. The Court therefore declines to hold an evidentiary hearing or to grant relief on Petitioner's fifth and final claim.

## V. Conclusion

The state appellate court's adjudication of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, nor an unreasonable determination of the facts. The state court's opinion also was not "so lacking in justification

that there was an error . . . beyond any possibility for fairminded disagreement." *Richter*, 562 at 103.

Accordingly, the Court DENIES the petition for writ of habeas corpus.

## VI. Certificate of Appealability

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Reasonable jurists could debate the Court's assessment of Petitioner's third claim regarding trial counsel's failure to investigate and produce Joyce Willett as a defense witness. At a minimum, reasonable jurists could conclude that this issue deserves

56

encouragement to proceed further.   The Court therefore grants a certificate of appealability on the third habeas claim.

Reasonable jurists would not find the Court's assessment of Petitioner's other claims debatable or wrong.   The Court therefore denies a certificate of appealability on claims one, two, four, and five.

Dated: June 29, 2016                    s/Judith E. Levy
Ann Arbor, Michigan                 JUDITH E. LEVY
                                                 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 29, 2016.

                                                 s/Felicia M. Moses
                                                 FELICIA M. MOSES
                                                 Case Manager

57